UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
Jose Adolfo Carbajal,

              Plaintiff,

              -against-

Village of Hempstead, Village of
Hempstead Police Department, Detective
Salvatore Mancuso *in his official and
individual capacity*, Detectives and Officers
John Does 1-10 *in their official and
individual capacities*, and John Does, M.D.
1-5 *in their official and individual
capacities*,

              Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**

02-CV-4270 (DLI)

**DORA L. IRIZARRY, U.S. District Judge:**

      Plaintiff's claims arise from an arrest allegedly involving mistaken identity. By decision dated July 12, 2003, U.S. District Judge Arthur D. Spatt granted defendants' motion to dismiss as to all plaintiff's claims except (1) false arrest, malicious prosecution, and deliberate indifference to medical treatment under 42 U.S.C. § 1983; (2) municipal liability against the Village of Hempstead under § 1983; and (3) conspiracy to falsely arrest and imprison plaintiff against Detective Mancuso and the John Doe detectives and police officers under 42 U.S.C. § 1985. *Carbajal v. County of Nassau*, 271 F. Supp. 2d 415, 419, 424 (E.D.N.Y. 2003). Defendants now move for summary judgment on the grounds of qualified immunity. For the reasons stated below, the court denies defendants' motion.

1

**I.     Facts**

Plaintiff is an El Salvador national living in the United States without a visa or green card and working at a roofing company. He has never been married. Plaintiff lived for seven years at 264 Stewart Avenue in Hempstead, New York, where a drug transaction was observed and videotaped by Hempstead detectives. Plaintiff was later arrested for this drug offense and told police officers that he was not the man on the videotape. Though plaintiff was unable to identify the individual on the videotape at the time of his arrest, he later discovered that it was a man named "Abel," or nicknamed "Catracho," who resided at 264 Stewart Avenue for around one month. In more detail, the facts surrounding plaintiff's arrest are as follows.

On March 16, 1999, defendant Detective Mancuso and three other detectives, Stephen Karlya, Donald Simone, and Frank Puma[1]—working together on a "long-term narcotics operation" at the Village of Hempstead Police Department—arranged with a confidential informant ("CI") to make an audio/videotape recording of a drug transaction. While walking on Van Cott Avenue in Hempstead, New York, the CI spotted a man whom he knew sold drugs and informed the detectives. The CI approached the man and followed him to 264 Stewart Avenue, in Hempstead, where the man entered through the front door and returned with a small plastic bag of twenty dollars worth of crack-cocaine. The man then sold the crack-cocaine to the CI. This transaction was recorded on the videotape. The transaction occurred in Spanish, and defendants have not rebutted that they never transcribed or translated the videotape. The detectives viewed the videotape later that day and made still photographs of the suspect. Of the four detectives, only Detective Mancuso testified to speaking

---

[1] These detectives have not been substituted for any of the "John Doe" detectives and the court does not know whether plaintiff intends to do so. From deposition testimony, it appears that only Detectives Mancuso and Karlya effectuated plaintiff's arrest.

"a little" Spanish. (Mancuso Dep. at 12.) Detective Karlya testified he understands "a little bit" of Spanish (Karlya Dep. at 333), and, though he did not understand the exact dialogue on the videotape, he understood that part of the conversation was "about work." (*Id*. at 339.)

The court has reviewed the videotape and the transcription/translation provided by the plaintiff. The videotape footage is in black and white, and the sound quality is fair, though from time to time the dialogue is unintelligible. As the CI is wearing the camera, there is a lot of movement in the frames, especially when the CI is walking. On the videotape, the CI asks the man who sells him the drugs what his name is, and the man responds "Abel." The man also tells the CI that he works in carpentry and mentions having been previously married and wanting to travel to Honduras, though the man does not make a specific statement about his nationality. There are not many clear images of "Abel," because often he and the CI are walking side by side. Also, apparently because of camera placement on the CI, in several frames, the top of Abel's head is not visible. However, as the still photographs show, Abel's face is visible in several frames on the videotape. After the CI completes the transaction and reunites with the detectives, the CI tells one of the detectives on the tape, in English, that the man who sold him the drugs "said his name," but the CI does not mention the name "Abel" and states instead that he does not remember the man's name. Detective Karlya testified at his deposition that the CI told him that the drug seller was named "Jose."[2] (Karlya Dep. at 61.)

On or about March 17 or 18, 1999, Detectives Mancuso, Karlya, Puma, and Simone visited 264 Stewart Avenue in Hempstead "to identify the guy that dealt drugs to [the] informant." (*Id*. at

---

[2] It should be noted that the CI used the name "Jose" during his encounter with the drug sale suspect.

101–02.) The detectives spoke to three adults who were living at the house: plaintiff, his sister, and plaintiff's brother-in-law, Mauro Polanco. Plaintiff testified at his deposition that his brother-in-law was not at home, but Detective Mancuso recalled that the brother-in-law was "short and stocky." (Mancuso Dep. at 54.) Plaintiff's sister's two children were also home at the time of the detectives' visit. The detectives spoke to plaintiff and his family under the guise that they were investigating children being left at home alone and asked who lived in the house. The detectives do not remember who responded specifically but testified that neither of the three adults indicated that any other adults lived at the home. Plaintiff testified that he did not mention anyone else who lived in the house "[b]ecause [the detectives] just came and asked about the family." (Carbajal 2004 Dep. at 23.) The detectives did not take any notes during this visit, but Detective Mancuso recalls plaintiff stating that he worked as a roofer. The officers concluded that plaintiff was the man on the videotape who sold the drugs to the CI but did not arrest him immediately because, under the long-term narcotics operation, it was their practice to make arrests several months later to protect the identity of the CI.

On October 22, 1999, while patrolling, Detectives Mancuso and Karlya and Detective Lieutenant Joseph Wing spotted plaintiff urinating against the side of a building on Clinton and Wellington Streets in Hempstead. The detectives arrested plaintiff for the narcotics sale that took place on March 16, 1999. Detective Mancuso testified at his deposition that plaintiff was never read his *Miranda* rights. Plaintiff alleges that, upon his arrival at the Hempstead Police Station, he was strip searched and taunted by police officers at the Station. Police officers showed plaintiff the videotape and/or still pictures from the tape, and plaintiff told the officers the images were not of him. Plaintiff was charged with possession and sale of a controlled substance in the third degree, in violation of New York Penal Law §§ 220.16(1) and 220.39(1), respectively. Plaintiff's bail was

4

set at $50,000, which plaintiff was unable to pay. After plaintiff's case was submitted to a Nassau County grand jury, all charges against him were dismissed. Plaintiff was released from custody on January 3, 2000.

Detective Karlya testified that he is unaware whether any of the detectives ever showed the CI a picture of plaintiff, but that he did not. Detective Karlya testified that, most likely, he had conversations with the CI sometime after plaintiff's arrest but could not remember the substance of such conversations, if any. When asked whether the CI had ever been asked to return to 264 Stewart Avenue to identify Mr. Carbajal, Detective Karlya testified that the CI "wouldn't do that." (Karlya Dep. at 274.) According to Detective Karlya, no further investigation was made to ascertain whether any other males, other than those observed during the detectives' visit, were living at 264 Stewart Avenue.

Plaintiff was deposed twice with the aid of an interpreter. Plaintiff's deposition testimony regarding when he knew that the man selling the crack-cocaine to the CI on the videotape had lived at 264 Stewart Avenue—and the living arrangements at the home—is inconsistent. Though plaintiff testified at a deposition on November 9, 2000 that he lived upstairs in March 1999 with his sister and her family, at a July 15, 2004 deposition plaintiff testified that, in March 1999, he lived in the basement with three other adults named Alejandro Campos, Maria Gonzalez, and "Apolinar," while his sister, brother-in-law, and two nephews lived upstairs. Plaintiff also testified at the 2004 deposition that it was not until late March that he saw another man at 264 Stewart Avenue and found out that this man, named "Abel," had been living upstairs for about a month. Thus, according to plaintiff, he was unaware of "Abel" at the time of the detectives' visit in March 1999. Plaintiff remembers "Abel" as a little shorter than him and approximately the same weight with the same hair

5

color. Plaintiff testified that, at the time of his arrest, he did not know the identity of the man selling crack-cocaine on the videotape but that a friend later looked at the still photos and identified him as "Catracho" (a nickname, according to plaintiff). While plaintiff testified in 2000 that he used the front door to enter 264 Stewart Avenue, consistent with living upstairs, in 2004 he testified that he accessed his living quarters in the basement through the rear door. Plaintiff also testified in 2000 that both Alejandro Campos and "Abel" accessed 264 Stewart Avenue through the rear door, which is inconsistent with plaintiff's 2004 testimony that he lived with Alejandro Campos in the basement and that "Abel" lived upstairs.

## II.     Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court must view all facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). In drawing inferences in favor of the nonmoving party, "the court is not entitled to weigh the evidence." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000). Nevertheless, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). The court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III. Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). "Summary judgment on the basis of qualified immunity is appropriate when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

For claims that require showing a lack of probable cause, such as false arrest and malicious prosecution, it is appropriate to grant qualified immunity to individual police officers where "either (a) it was objectively reasonable for the officer[s] to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Walker v. Mendoza*, No. 00-CV-93, 2000 WL 915070, at *7 (E.D.N.Y. June 27, 1993) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). The defendants thus argue that there was either actual probable cause or arguable probable cause to arrest plaintiff.

As enunciated by the Second Circuit, "probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989). In cases of mistaken identity, the first inquiry

7

is whether there was probable cause to arrest the person intended, and the second question is whether, considering the totality of circumstances surrounding the arrest, the police officers' mistake was reasonable. *See, e.g.*, *Hill v. California*, 401 U.S. 797, 802–03, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971); *United States v. Valez*, 796 F.2d 24, 26 (2d Cir. 1986); *see also Saucier*, 533 U.S. at 206 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.").

While the detectives clearly had probable cause to arrest the individual on the videotape who completed the drug transaction with the CI, it is less certain that the detectives were reasonable in their belief that plaintiff Jose Carbajal was the man on the videotape. Defendants argue that, in being told that no other adults lived at 264 Stewart Avenue, their belief that plaintiff resembled the man on the videotape and was the correct suspect was reasonable. Plaintiff, on the other hand, insists that, had the officers transcribed and translated the videotape, they would have been alerted that the true suspect was a man named "Abel" from Honduras[3] who was once married and was working in carpentry—not the plaintiff, a man named "Jose" from El Salvador who had never been married and was working in roofing.

The fact that police officers arrest an individual with a different name than the one used by the actual perpetrator is, by itself, insufficient for a finding that the arrest was unreasonable, since, as the Supreme Court has recognized, "aliases and false identifications are not uncommon." *See Hill*, 401 U.S. at 803. Regarding the detectives' failure to undertake further investigation, including

---

[3] Though plaintiff insists that the man on the videotape has a Honduran accent, "Abel" only mentions traveling to Honduras rather than any reference to his nationality.

obtaining a translation of the videotape dialogue, "the police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had knowledge of the lead and the capacity to investigate it." *Richards v. City of New York*, No. 97 Civ. 7990, 2003 WL 21036365, at *15 (S.D.N.Y. May 7, 2003) (quoting *Gisondi v. Harrison*, 72 N.Y.2d 280, 285 (1988)). Yet "the police may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause." *Id*. (citing *Gisondi*, 72 N.Y.2d at 285). Indeed, "a failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause." *Id*. (quoting *Ramos v. City of New York*, 729 N.Y.S.2d 678 (1st Dep't 2001)).

Here, particularly where plaintiff's claims include malicious prosecution, a jury could find that no reasonably competent police officer would have proceeded to arrest plaintiff—not in an emergency situation but several months later—without knowing the contents of the videotape dialogue or obtaining a positive identification from the CI, who was the only person who directly spoke to the man selling drugs on the videotape. Although, based on the court's review of the pictures of plaintiff as provided by the parties, there are arguably some resemblances between plaintiff and the man on the videotape, a jury could conclude that the two men are so dissimilar that reasonable officers would not disagree on whether to arrest plaintiff when faced with the evidence available. In sum, a "reasonable trier of fact could find that the defendants' actions were objectively unreasonable." *See Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). Under the totality of circumstances, the court is unable to determine as a matter of law that the individual defendants are entitled to qualified immunity, and the matter should be submitted to a jury.

**IV. Conclusion**

For the reasons set forth above, defendants' motion for summary judgment on qualified immunity grounds is denied.

SO ORDERED.

DATED:   Brooklyn, New York
         March 29, 2006

_____/s/_____
DORA L. IRIZARRY
United States District Judge